|  |  |  |
|---|---|---|
| SHERNETT CAMPBELL, individually and as guardian ad litem of Keven Davis, an infant | : : : : | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY |
| Plaintiff, | : : | |
| -vs- | : : | Civil Action No. 02-2871 (WGB) |
| UNITED STATES OF AMERICA | : : | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| Defendant. | : : | |

**Appearances:**

Peter A. Bogaard, Esq.
Kessler, Digiovanni & Jesuelle, LLP
773 Central Avenue
PO Box 2429
Westfield, NJ 07091
   Attorney for Plaintiff

Pamela R. Perron, Esq.
Yanet Perez Noble, Esq.
U.S. Department of Justice
Assistant United States Attorney
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07102
Civil Division
   Attorney for Defendant

**ARLEO,** United States Magistrate Judge**:**

**INTRODUCTION**

Plaintiff, Shernett Campbell ("Campbell") individually and as guardian *ad litem* of Keven Davis, her infant son, brought this action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, and the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g) - (n).  She seeks damages for alleged personal injuries she and her son sustained during his delivery on July 26, 1999 at Muhlenberg Regional Medical Center ("Muhlenberg").

Campbell claims that the doctors and nurse-midwives[1] employed by Plainfield Neighborhood Health Center ("PNHC"), a federally funded health center, deviated from accepted standards of medical care with respect to the delivery of her baby.  Specifically, Campbell contends that Defendants (1) failed to order a fourth ultrasound during the fortieth week of gestation to estimate fetal weight when they suspected the baby would be large for gestational age, and (2) consequently failed to present an alternative course of delivery, namely, an elective cesarian section ("c-section"). Campbell gave birth vaginally to a 12 pound 4 ½ ounce baby, and claims that she and her son suffered permanent injuries therefrom. Finally, Campbell contends that upon discharge from Muhlenberg, Defendants failed to advise her to take stool softeners, which further aggravated her alleged injuries.

---

[1] Prior to trial, the claims against the individual defendants (who were various healthcare providers) were dismissed, and the United States was substituted as the sole defendant. However, where this Opinion refers to multiple parties, the Court uses the term "Defendants."

From April 19 to April 23, 2004, I presided over a non-jury trial in which the parties were afforded a full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issues and to argue the law and the evidence.

Below I make the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) based on the competent evidence presented at the trial:

**FINDINGS OF FACT**:[2]

1. Campbell, at age thirty-seven, came under the care of PNHC for her pregnancy on January 19, 1999. She had previously given birth vaginally to a baby girl weighing approximately 6 ½ pounds. (Stip. 1, Jt. Pretrial Order at 1.)

2. Plaintiff received comprehensive pre-natal care as a patient at PNHC. Campbell was examined at PNHC by experienced certified midwives, Kathryn McElroy ("McElroy") and Shirley McDuffie ("McDuffie") on eleven occasions between January 1999 and July 1999. (Stip.2, Jt. Pretrial Order at 2.)

3. Ultrasounds were performed three times during the course of the pregnancy: the first, on February 8, 1999, at approximately sixteen weeks; the second, on March 2, 1999, at approximately twenty weeks; finally, the last, performed on May 27, 1999, at approximately thirty weeks, which showed "appropriate interval growth," and confirmed a due date of July 26, 1999. (Id.) The ultrasounds also showed the presence of a fundal fibroid, which the nurse-midwives monitored appropriately. The fibroid did not interfere with the growth or development of the fetus.

---

[2] These facts incorporate the stipulations of the parties set forth in the Pretrial Order or agreed to at trial.

4. In addition to the ultrasounds, Campbell received two glucose tests, which confirmed that she was not diabetic. (Id.) A diabetic pregnant woman is at greater risk for giving birth to a macrosomic baby.[3] (Quartell, at 16.)[4]

5. Campbell also received genetic counseling and an amniocentesis to address any possible chromosomal abnormalities of the fetus. The test results were normal. (McElroy, at 149.) At trial, there was no dispute that all of the pre-natal care that the PNHC employees provided up through July 21, 1999 was appropriate. (Soffer, at 125-27.)

6. On Thursday, July 22, 1999 (four days before her due date), Campbell was examined by nurse-midwife McElroy during her visit. At that visit, Campbell complained of pelvic discomfort and pedal edema (swelling of feet). McElroy was supervising Susan Wells ("Wells"), a student nurse-practitioner, that day. (McElroy, at 150-51.) Wells and McElroy both performed Leopold's maneuvers[5] on Campbell during the visit. (McElroy, at 152.) McElroy also measured the fundal height. (Id. at 153.) Based on these measurements, McElroy estimated that the baby was between 8 and 8 ½ pounds. (Id. at 152.) She did not suspect macrosomia. (Id. at 159.)

7. After her examination of Campbell, McElroy consulted with the obstetrician/gynecologist on duty, Robert Beim, M.D. ("Dr. Beim"), who examined the patient with her. (Id. at 151-52, 157-58.) McElroy's management plan at this point was to induce delivery on the due date, July 26, 1999.

---

[3] Macrosomia is a condition where the baby, at birth, weighs over 4500 grams, or ten pounds. There was varied trial testimony on the definition of "macrosomia." Although a fetus's weight can be estimated in utero, macrosomia can only be conclusively determined at birth.

[4] References to the trial transcript are indicated by the name of the witness and page number.

[5] Leopold's maneuvers are a series of abdomen palpations performed to determine fetal position and also to estimate fetal weight.

Dr. Beim concurred in this plan. (Stip.3, Jt. Pretrial Order at 2.) Dr. Beim and McElroy discussed the possibility of getting a fourth ultrasound to check the fetal weight. (McElroy, at 157.) They recognized that to schedule a Level II ultrasound on a non-emergent basis would take approximately one to two weeks. (Id. at 159.) Considering all the factors, including Campbell's prior vaginal delivery, her large "proven" gynecoid pelvis,[6] and her growing discomfort, Dr. Beim and McElroy concluded that induction was the appropriate course of treatment.

      8. McElroy spoke to Campbell about inducing labor on Monday, July 26, 1999, her actual due date. (Jt. Exh. 1, at 20; McElroy, at 153-54.) She did not discuss the option of performing an elective c-section with Campbell because she did not believe it was indicated at the time. (McElroy, at 154.) Assessing the situation with Campbell, McElroy believed that an induction and a vaginal delivery would be the best course of treatment. (McElroy, at 153-54.) Campbell agreed, and McElroy scheduled the induction.

      9. Student Wells wrote a "progress note" for Campbell's July 22, 1999 visit. (McElroy, at 152.) She entered a note in the chart which indicated, inter alia, "r/o macrosomia . . . will induce on 7/26/99." The note also indicated "EFW-?"[7] (Jt. Exh. 1, at 10), but there is no recorded estimated fetal weight in the chart. McElroy did not review or co-sign the note because she was on the phone with Muhlenberg scheduling the induction as well as speaking with Campbell. (McElroy, at 160.) However, McElroy testified that she did not believe the baby was macrosomic, and that Campbell

---

[6] A large gynecoid pelvis is a round pelvis where the diameter between the ischial spines measures more than twelve centimeters. A "proven" pelvis describes a woman who has previously given birth vaginally. The birth process changes the pelvis: it stretches the ligaments, the muscles, and the nerves making subsequent deliveries easier.

[7] "EFW" stands for estimated fetal weight.

was not sent for an induction due to suspected macrosomia. McElroy's testimony on this point was credible.

10. Campbell was admitted to Muhlenberg on the morning of July 26, 1999 under the care of midwife McDuffie and Dr. Mary Powderly ("Dr. Powderly"), director of the OB/GYN Department at PNHC. (Jt. Exh. 3, at 12.) She presented weighing 208 pounds, and was having contractions every six to eight minutes. The admitting examination revealed that she was already two centimeters dilated. Campbell was in the early latent phase of labor when she arrived at Muhlenberg. (Quartell, at 43.)

11. At approximately 9:30 a.m., McDuffie performed a cervical exam and Leopold's maneuvers on Campbell. (Jt. Exh. 3 at 12; McDuffie, at 11-12) McDuffie's contemporaneously recorded note indicated an estimated fetal weight of 9 pounds. (Joint Exh. 3, at 12.) McDuffie discussed her findings, including estimated fetal weight, with Dr. Powderly. (McDuffie, at 12.)

12. Dr. Powderly also reviewed Campbell's chart and examined her. (Powderly, at 174-75.) Dr. Powderly determined that Campbell had a large gynecoid pelvis. (Id. at 176-77.) She also estimated the fetal weight of the baby to be approximately 9 pounds, which was large for gestational age,[8] but Dr. Powderly testified that she did not suspect macrosomia. (Id. at 177.) Consequently, Dr. Powderly decided to follow a standard induction procedure and a trial of labor based on her estimates of fetal weight. (Id. at 177-78.) Dr. Powderly's testimony on this point is credible.

13. Anthony Quartell, M.D., Defendants' expert in obstetrics and gynecology, testified at trial that there are several methods for estimating fetal weight. These methods include (1)

---

[8]Large for gestational age is a clinical estimation describing a fetus weighing at least nine pounds or one that is greater than ninety percent of all babies delivered.

comparing fundal height to gestational age; (2) performing Leopold's maneuvers; and (3) performing an ultrasound.  Neither method is more accurate than any other.  The Court finds Dr. Quartell's testimony to be trustworthy and supported by his expertise in obstetrics.

14.  After consultation, Dr. Powderly and McDuffie explained the induction and trial of labor plan to Campbell.  Dr. Powderly explained to Campbell that she felt Plaintiff could successfully deliver vaginally and that the induction of labor would proceed according to standard protocol.  (Id. at 175-76.)  Furthermore, Dr. Powderly informed Campbell that in case of any difficulty, such as labor failing to progress, the patient "[falling] off Friedman's curve,"[9] or fetal distress, Dr. Powderly would perform a c-section.

15.  It was undisputed at trial that Campbell's labor did in fact proceed normally, in accordance with Friedman's curve.  From the point of Campbell's induction, throughout her delivery, labor did not fail to progress. (Soffer, at 127.)  Indeed, Plaintiff's expert for obstetrics and gynecology, Jeffrey C. Soffer, M.D., testified that the induction was properly performed, and the labor progressed "nicely." (Id. at 127-29.)

16.  McDuffie examined Campbell at approximately 4:30 p.m.  Prior to that time, Campbell had received an epidural.  McDuffie noted that the contractions were in a pattern, and that the baby was not in any distress.  (Jt. Exh. 3, at 12a; McDuffie, at 18.)

17.  Dr. Powderly examined Campbell again at approximately 5:00 p.m.  (Jt. Exh. 3, at 19; Powderly, at 179-81.)  Dr. Powderly determined that she was progressing well through labor, and that there was no reason to send her for an ultrasound or to perform a c-section.  (Powderly, at 180-

---

[9]"Friedman's curve" plots the expected progress of labor which is demonstrated by the cervix dilating at the rate of at least one centimeter per hour and active pushing that does not continue for more than one hour.  (Powderly, at 178.)

82.) In fact, Campbell exceeded Friedman's curve and went through labor more quickly than anticipated. (Powderly, at 179; McDuffie, at 18.)

18. C-sections are surgical procedures which carry significant risks for the mother. Risks include damage to surrounding organs, hemorrhage, blood clots, bowel obstructions, and infection leading to septicemia which can result in hysterectomy. (Soffer, at 117-18.)

19. Campbell started pushing at approximately 6:40 p.m. (Jt. Exh. 3, at 12a; McDuffie, at 19.) McDuffie performed an episiotomy under local anesthesia. (McDuffie, at 19.) During the delivery, the baby's head crowned and then retracted back up to Campbell's perineum, a movement referred to as the "turtle sign." (McDuffie, at 19; Powderly at 182.) This is a warning sign of shoulder dystocia. (Powderly, at 182.) McDuffie immediately recognized that the baby's shoulder was stuck behind the mother's pubic bone. (McDuffie, at 19-20.)

20. Shoulder dystocia is a condition that occurs when the baby's shoulder is stuck behind the mother's pubic bone and consequently obstructed in its passage from the vagina.

21. McDuffie alerted Dr. Powderly. Dr. Powderly and the pediatrician on call, Dr. Huey, came to the delivery room immediately. (McDuffie, at 20.) Measures were taken to increase the space available for the baby's passage through the birth canal: a Foley catheter was placed to drain Campbell's bladder; Dr. Powderly extended the episiotomy; Campbell's body was maneuvered into a McRoberts position. (Powderly, at 182-83.) Plaintiff's expert, Dr. Soffer, conceded at trial that these procedures were performed correctly. (Soffer, at 127-29.)

22. McDuffie applied suprapubic pressure and Dr. Powderly applied traction to the baby's head. The shoulder dislodged and the baby was delivered with the next contraction. (McDuffie, at 20.) The baby was immediately handed over to Dr. Huey. (Id.) Vaginal delivery occurred at 7:07

p.m.  He weighed 12 pounds 4 ½ ounces.  (Stip. 8, Jt. Pre-Trial Order at 3.)

23.  Shoulder dystocia occurs in approximately one out of 1,000 births without regard to fetal weight.  (Quartell, at 27.)  Dystocia is a problem associated with vaginal delivery.  There are varying degrees of severity of dystocia.  Mild to moderate dystocia is resolved with suprapubic pressure.  Shoulder dystocia can lead to injury to the fetus, including, *inter alia*, injury to the brachial plexus[10] resulting in Erbs palsy or Klumke's palsy.  Brachial plexus injuries can resolve spontaneously over time as neurologic recovery occurs.  (Diamond, at 132, 144.)

24.  During delivery, Campbell suffered a partial third-degree laceration of the perineum right below the area of the episiotomy.  The laceration was properly repaired by Dr. Powderly.  (Soffer, at 128-29.)  Partial third-degree lacerations commonly occur in 20 to 30 percent of all deliveries.  (Quartell, at 50.)

25.  Upon discharge from Muhlenberg, PNHC's agents did not prescribe stool softeners for Campbell.  (Powderly, at 185.)  When a tear of the rectal mucosa or a complete laceration of the anal sphincter (i.e., a complete third-degree or a fourth-degree laceration) occurs during delivery, standard medical protocol requires the patient to take stool softeners for seven to ten days post-partum to protect the repair from breakdown.  (Id.; Quartell, at 59.)  Campbell did not have that degree of laceration, thus, stool softeners were not prescribed.  Campbell was given a laxative at the hospital and moved her bowels before discharge without problem.  (Campbell, at 72; Jt. Exh. 3, at 34.)

26.  On July 28, 1999, the baby, Keven Davis, was x-rayed at Muhlenberg and diagnosed

---

[10]The brachial plexus is a network of nerves that branch out from the cervical spine and go to different muscles in the upper extremities and shoulders.

with a dislocated right shoulder. (Stip. 4, Jt. Pre-Trial Order, at 3.) Keven Davis was later diagnosed with a brachial plexus injury resulting in a mild right Erbs palsy.

27. Defense expert, Martin Diamond, M.D., a specialist in pediatric physiatry, testified that Keven's brachial plexus injury was resolving to the extent that, upon examination, Keven's ability to move seemed unimpaired and his wrist, hand and finger movements were normal. (Diamond, at 151-56.) Dr. Diamond further indicated that Keven's play skills were normal for his age, that he was verbal and conversant with no evidence of other developmental problems, that there was no indication that Keven was in any pain or had any abnormalities in sensation that would limit his ability to use his hands. Finally, Dr. Diamond testified that no ongoing formal therapy or intervention is necessary; simply performing normal childhood activities would help to strengthen his muscles and develop coordination. (Diamond, at 158-59.) The Court finds Dr. Diamond's testimony credible and persuasive.

28. Keven was also diagnosed with a mild ptosis affecting his right eye. A ptosis is a drooping of the eyelid.

29. Rudolph S. Wagner, M.D., a pediatric ophthalmologist, testified for the defense that Keven has a slight ptosis of the right eyelid which does not affect his vision or eye function in any way. Keven's pupils are not unequal. No surgery is necessary to correct the condition. Moreover, Dr. Wagner testified that the origin of the majority of isolated findings of ptosis, like the kind Keven has, cannot be determined, and is not necessarily a result of shoulder dystocia during delivery. Dr. Wagner's testimony on this point was credible and persuasive.

30. Campbell had her first post-partum visit at PNHC on August 10, 1999. At this time, she did not complain of hard stools, pain in the perineal/rectal area, or fecal incontinence. (Jt. Exh. 1,

at 9.)  Upon examination, McDuffie found a small cystocele and rectocele.  (Jt. Pre-Trial Order at 16.)  A rectocele is a condition where the bottom of the vagina is herniated upwards, by the forces of the rectum below.  A cystocele is a similar condition but the herniation occurs from the top of the vagina.  Both conditions can be associated with vaginal deliveries.  (Soffer, at 57.)  They are common in women who have given birth.  (Jt. Exh. 1 at 9; Quartell, at 55-57.)  Both conditions become less pronounced within approximately one year after giving birth.  (Quartell, at 57.) Additionally, McDuffie observed during this visit that Campbell's anal sphincter was "intact" with "good rectal tone and control."  (Jt. Exh. 1, at 9; McDuffie, at 23.)  There was no evidence of a breakdown of either the sutures or the episiotomy.  (Jt. Exh. 1, at 9; McDuffie, at 24.)

    31.  McDuffie saw Campbell again on September 13, 1999 for a second post-partum visit. At this visit, Campbell complained of some normal pelvic discomfort.  (McDuffie, at 24.)  McDuffie noted in the chart that Campbell's menses had not resumed and that she had not yet engaged in coitus.  (Jt. Exh.1, at 8.)  Campbell requested birth control.  (Id.)  At this visit, Campbell did not complain of hard stools, constipation, or fecal incontinence.  (Id.)   McDuffie performed a digital examination of Campbell's rectum.  (McDuffie, at 25.)  She found her rectal tone to be good.  (Id.) McDuffie advised Campbell to continue to do Kegel exercises for six months and return for re-evaluation in six months.  (Id. at 26; Jt. Exh. 1, at 8.)  There was no evidence at this point of a breakdown of the episiotomy or repair of the laceration. (Jt. Exh. 1, at 8; McDuffie, at 26.) The Court credits McDuffie's testimony on this point.

    32.  Campbell did not return to PNHC for a six-month check-up.  (Campbell, at 35.)

    33.  Instead, on March 30, 2000, approximately eight months after delivery, Campbell saw Dr. Elrick A. Murray for complaints of lower abdominal pain and pain with intercourse.  (Campbell,

-11-

at 79-80.) At this visit, Campbell did not complain of fecal incontinence. Dr. Murray referred Campbell to a doctor at St. Peter's University Hospital ("St. Peter's") for treatment of vaginal vault prolapse. (Jt. Exh. 7.)

  34. Campbell did not seek the referral appointment at St. Peter's until August 10, 2000, more than one year after delivery. On that date, Campbell was examined by Dr. Hatangadi. For the first time Campbell complained of fecal incontinence, urinary incontinence, and passing "gas through vagina." (Jt. Exh. 5, at 126; Soffer, at 146.) Dr. Hatangadi ultimately performed two surgeries: a sphincterplasty, to repair the anal sphincter muscle, and a colporraphy, to repair a rectocele.

## **CONCLUSIONS OF LAW**

  1. This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b).

  2. Venue properly lies in this judicial district. 28 U.S.C. § 1391(b).

  3. The parties have consented to my jurisdiction. 28 U.S.C. § 636(c).

  4. This case arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, which provides in pertinent part that:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 2674.

  5. The alleged actions at issue in this case occurred in New Jersey. Therefore, this Court

applies New Jersey law to resolve the matter.

      6. Campbell bears the burden of proving all of the elements of her medical negligence claims. A claim for medical malpractice and a claim for failure to obtain informed consent are "subgroups of a broad claim of medical negligence." Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537, 545 (2002).

      7. To prove medical malpractice, Campbell must present expert testimony to prove "(1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Gardner v. Pawliw, 150 N.J. 359, 375 (1997). The proximate cause inquiry in the instant situation where Campbell's claim is premised on a preexisting condition, that being pregnancy, requires her to "demonstrate to a reasonable degree of medical probability that the failure to give the test increased the risk of harm from the preexistent condition." Id. at 387.

      8. "[T]o sustain a claim based on a lack of informed consent, the patient must prove that the doctor withheld pertinent medical information concerning the risks of the procedure or treatment, and alternatives, or the potential results if the procedure or treatment were not undertaken." Howard, 172 N.J. at 548. The *prima facie* elements are "(1) the physician failed to comply with the reasonably-prudent-patient standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the [procedure] had she been so informed; and (4) the [procedure] was a proximate cause of the plaintiff's injuries." Howard, 172 N.J. at 549 (citations omitted). The proximate causation inquiry of an informed consent claim has two prongs: first, the patient must demonstrate that the undisclosed risk actually materialized; second, that the injury to patient resulted from treatment provided. Id. (citing Canesi v. Wilson, 158 N.J. 490, 505-06 (1999)).

9. The objective "prudent patient" standard is defined as "all material information that a prudent patient might find significant for a determination of whether to undergo the proposed therapy." Blazoski v. Cook, 346 N.J. Super. 256, 267 (App. Div. 2002).

10. Not every risk need be disclosed. Id. at 268.

11. The test for determining whether a particular risk is significant, and therefore must be disclosed, is whether the risk is material to the patient's decision. Id. "A risk is deemed 'material' when a reasonable patient in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether to forego the proposed therapy or to submit to it." Id. (citations omitted).

12. In according significance to a particular risk, no bright line measure exists. Id. "Rather, whenever nondisclosure of a particular risk is open to debate by reasonable-minded persons," the issue of the significance of the risk is one for the fact finder. Id.

13. The overwhelming evidence at trial demonstrated that Defendants exercised proper medical judgment and did not deviate from the accepted standard of care as it relates to the measurement of fetal weight.[11]  First, this Court finds that a failure to order the ultrasound at any point during her pregnancy was not medical malpractice. Based on the competent evidence presented at trial, this Court finds that performing Leopold's maneuvers to determine fetal weight was medically acceptable and appropriate at this late stage of pregnancy.

14. As mentioned above, Dr. Quartell testified that there are three methods for estimating

---

[11] In Plaintiff's proposed findings submitted to the Court after the trial, the only claim addressed sounds in informed consent. However, the Court notes that in the Joint Pre-Trial Order, Plaintiff articulates her claim as whether Defendants deviated from accepted standards of medical and midwifery obstetrical practice in their care and treatment of Plaintiff. The Court will address both claims herein.

fetal weight, none being more accurate than the other. Dr. Quartell's testimony on this point was credible. Thus, the use of Leopold's maneuvers in the fortieth week of gestation is at least as accurate as ultrasound to measure fetal weight. Leopold's maneuvers were performed here by multiple healthcare professionals none of whom suspected a macrosomic baby as a result of their examinations. Thus, the Court finds that Defendants adhered to the applicable standard of care in their use of Leopold's maneuvers to determine fetal weight; consequently, Defendants did not deviate from the standard of care when they proceeded to induction and a trial of labor based on their estimations of fetal weight, rather than obtain a fourth ultrasound.

15. Furthermore, this Court finds that Campbell's claim for informed consent fails as a matter of law. The overwhelming trial evidence demonstrated that performing a c-section was not medically indicated. Campbell has not met her burden to prove that Defendants failed to disclose material risks to her in the decision to proceed with a vaginal delivery.

16. The plan to induce Campbell and to proceed with a trial of labor was consistent with the appropriate standard of care. Thus, there was no need to discuss the option of performing an ultrasound or a c-section.

17. Defendants estimated, based on their reasonable examinations, that the fetus weighed between 8 and 9 pounds. Thus, there was no duty to disclose risks associated with a suspected macrosomic delivery.

18. Although the fetus was suspected to be large for gestational age, the doctors and midwives who examined Campbell on July 22, 1999 at PNHC for her final clinic visit, and again on July 26, 1999 at Muhlenberg, mere hours before delivery, reasonably believed that Campbell could succeed at labor based on her prior vaginal delivery and her large, "proven" pelvis.

19. The healthcare professionals here were not responsible to explain every conceivable risk associated with delivering a baby. Rather, they were only obligated to disclose those risks that were material to Campbell's decision to be induced and to attempt labor. Campbell was thoroughly apprised of all material facts associated with childbirth; she was apprised of her medical treatment plan for the birth and she consented to it. The disclosure was reasonable and appropriate under the circumstances. This Court is satisfied, based on the overwhelming trial evidence, that Defendants did not deviate from any accepted standards of care by failing to disclose any material information.

20. Since this Court finds no deviation from accepted standards of care in the failure to order an ultrasound or based on informed consent, the Court does not reach the issue of Campbell's damages.

21. This Court also finds that Defendants did not deviate from accepted standards of medical care by failing to prescribe stool softeners for a partial third-degree laceration of the perineum.

22. Even if this Court were to find a deviation from accepted medical standards related to stool softeners (it has not), Campbell has failed to prove proximate causation. Campbell did not complain of fecal incontinence, urinary incontinence, or passing gas through her vagina at either of the two post-partum examinations at PNHC in August and September 1999. Both of Campbell's post-partum examinations at PNHC were normal. After the September 1999 post-partum visit, Campbell never returned to PNHC. This Court finds that Campbell has failed to prove any causal connection between her alleged injuries, about which she did not complain to any healthcare professional until more than one year after the delivery, and Defendants' conduct.

23. Since this Court finds that there was no medical malpractice by Defendants, it does not reach the issue of damages as to Keven Davis.

**CONCLUSION**

For the foregoing reasons, a judgment in favor of Defendant, United States of America, and against Plaintiff, Shernett Campbell, individually and as guardian *ad litem* of Keven Davis, shall be entered. A Form of Order consistent with these Findings of Fact and Conclusions of Law is attached.

____*s/Madeline Cox Arleo*_____
**MADELINE COX ARLEO**
**United States Magistrate Judge**


Date:           June 9, 2005

Original:       Clerk of the Court

cc:             Peter A. Bogaard, Esq.
                Kessler, Digiovanni &Jesuelle, LLP
                773 Central Avenue
                PO Box 2429
                Westfield, NJ 07091

                Pamela R. Perron, Esq.
                Yanet Perez Noble, Esq.
                U.S. Department of Justice
                Assistant United States Attorney
                District of New Jersey
                970 Broad Street, Suite 700
                Newark, NJ 07102
                Civil Division